UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| CHARLES A. BENSON, )<br> )<br>      Plaintiff, )<br> )<br>   v. )<br> )<br>RICHARD BROWN, )<br> )<br>      Defendant. ) | No. 2:19-cv-00065-JRS-MJD |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

For the reasons explained in this Entry, the motion for summary judgment filed by defendant Richard Brown, dkt. [32], is **granted.**

## I. Background

Indiana prisoner Charles Benson brings this 42 U.S.C. § 1983 civil rights action against four defendants. Claims against three of the defendants were dismissed at screening. Dkt. 8. The remaining defendant, Warden Richard Brown, has moved for summary judgment.

In his amended complaint, Mr. Benson alleges that the conditions of his confinement in disciplinary restrictive housing in the Security Control Unit (SCU or SHU) at Wabash Valley Correctional Facility (Wabash Valley) violated his Eighth and Fourteenth Amendment rights. Dkts. 8, 15, 16. The summary judgment motion is fully briefed and ripe for resolution.

## II. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted).

1

"A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.* 892 F.3d 887, 893 (7th Cir. 2018).

### III. Discussion

#### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Benson as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

At all times relevant to this lawsuit, Mr. Benson was confined at Wabash Valley. He was transferred there on June 29, 2018. Dkt. 32-1, 11:12-14 (Benson Dep.).

Since 2016, Mr. Benson has been found guilty on three different conduct reports for assaults on Indiana Department of Correction (IDOC) staff. *Id.*, 15:17-16:12. Sanctions for each of the assaults on staff included time in disciplinary segregation in the SHU. *Id.*, 16:15-17:9. Since being placed in the SHU at Wabash Valley, Mr. Benson has received five or six additional conduct reports. *Id.*, 18:6-9. One of the conduct reports Mr. Benson received in the SHU was for threatening

IDOC staff. *Id.*, 18:17-25. As of December 5, 2019, Mr. Benson was scheduled to be in disciplinary segregation until October 16, 2020. *Id.*, 19:11-14.

### 1. Temperature in cell

Mr. Benson's cell includes a bed, blankets, pillow, sink, toilet, television, desk, chair, and a window that looks out into the range. Dkt. 32-1, 35:20-37-5. Mr. Benson's bed is long enough that he can lie flat with room to spare. *Id.*, 35:20-36:4.

"[F]or a little while" Mr. Benson's cell "was kind of cold." *Id.*, 28:7-13. During the winter of 2018-2019, Mr. Benson experienced the most issues with cold temperatures in his cell. *Id.*, at 41. Cold air was coming out of the vent instead of hot air. This issue was remedied by the facility after approximately one and a half to two months. *Id.,* 42:16-43:10. More than once, Mr. Benson's hands have gotten cold enough that a nurse has had difficulty getting a pulse or temperature reading from his finger. *Id.*, 39:4-25.

Mr. Benson has also experienced a cold cell during the summer because of the air conditioning. *Id.,* 40:21:41-7. He submitted a request for interview form to the Warden's office on July 7, 2019, complaining about air circulation on the range. Defendant Brown responded on July 11, 2019, stating parts had been ordered and that the issue would be addressed soon. Dkt. 32-3 at ¶ 4.

Mr. Benson's cell contains two vents. Dkt. 32-1, 37:6-7. One of the vents in his cell sucks in air, while the other vent blows air into the cell. *Id.*, 37:12-23. Mr. Benson notices heat come in and out of his cell. *Id*, 39:8-10.

At one point during Mr. Benson's confinement in the SHU, there was a natural gas smell coming through one of the vents in his cell. *Id.*, 38:3-8. He spoke with a grievance specialist about the smell and the situation was addressed. *Id.,* 38:13-25.

### 2. Clothing

When Mr. Benson was transferred to the SHU, he was issued one jumpsuit, three t-shirts, three pairs of boxers, three pairs of socks, two towels, and a winter hat. Dkt. 32-1, 43:25-44:8. He has been provided with slip on shoes. *Id.,* 65:18-66:7. Mr. Benson had previously requested a coat and was told to contact the property officer. *Id.*, 46:9-18. When he wrote the property officer about a coat, he did not get a response. *Id.*, 47:6-12. But after talking with Sergeant Busby he received a coat that day, between the end of September and the end of November 2018. *Id.*, 44:19-46:8. He can swap out his clothes for new ones every six months or so. *Id.*, 48:11-23.

Mr. Benson's clothes are laundered twice a week. *Id.,* 49:15-16. Mr. Benson is allowed to order thermal clothing and gloves from commissary. *Id.*, 28:21- 23; 59:19-60:7.

### 3. Food, Commissary, and Hygiene

Mr. Benson is provided three meals a day. Dkt. 32-1, 34:9-25. He can order commissary items from the form titled IDOC Disciplinary Form 06E-WVC (Disciplinary Form). *Id.,* 50:6-22; dkt. 32-2; dkt. 32-3 at ¶ 5. Offenders can order deodorant, toothpaste, nail clippers, toothbrushes, shampoo, lotion, thermal clothing and gloves using the Disciplinary Form, but they are what Mr. Benson considers "cheap" or "generic" brands. Dkt. 32-1, 51:13-24; 52:12; 53:17-25; 54:2-4; 59:19-60:7; dkt. 32-2. Offenders in disciplinary segregation are not permitted to order from the same commissary forms as offenders in administrative segregation as a way to incentivize good behavior and deter conduct that results in placement in disciplinary segregation. Dkt. 32-3 at ¶ 7.

Mr. Benson only has access to razors and toenail clippers when he showers. He is permitted to keep other hygiene items in his cell. Dkt. 32-1, 58:23-59:3. Mr. Benson showers every other day. *Id.*, 59:4-5.

### 4. Programming

Mr. Benson has been referred to participate in the ACT Program, which helps offenders transition from segregation units back to general population. Dkt. 32-1, 61:10-21. He is permitted to attend inside and outside recreation. *Id.*, 66:14-20. He has the option of staying in his cell instead of attending recreation. *Id.,* 68:4-11.

### B. Analysis

Mr. Benson alleges that he is confined in his cell 23 hours a day without the ability to order certain hygiene, food, shoes, and clothing items from commissary or to participate in educational or recreational programs because he is in disciplinary segregation. Dkt. 16 at 4; dkt. 32-1 at 31. He alleges that he has been confined under harsh conditions in a small, poorly ventilated, cold cell. *Id*. Mr. Benson has not been afforded the same privileges as offenders in administrative segregation. Dkt. 16 at 3; dkt. 32-1 at 30-32. He brings his claims under the Eighth Amendment and the Fourteenth Amendment due process and equal protection clauses. The Court turns to the Eighth Amendment claims first.

#### 1. Eighth Amendment Claims

The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (citation and internal quotations omitted). Pursuant to the Eighth Amendment, prison officials have the duty to provide humane conditions of confinement: "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (internal quotation omitted). To succeed on a conditions-of-confinement claim under the Eighth Amendment, a plaintiff must demonstrate that 1) he was incarcerated under conditions

that posed a substantial risk of objectively serious harm, and 2) the defendants were deliberately indifferent to that risk, meaning they were aware of it but ignored it or failed "to take reasonable measures to abate it." *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Townsend v. Fuchs,* 522 F.3d 765, 773 (7th Cir. 2008) (citing cases).

As noted, to satisfy an Eighth Amendment conditions-of-confinement claim, a plaintiff must establish an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). The objective showing means "that the conditions are sufficiently serious—*i.e.*, that they deny the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Id.* (internal quotation omitted). "According to the Supreme Court, … 'extreme deprivations are required to make out a conditions-of-confinement claim.'" *Id.* (quoting *Hudson*, 503 U.S. at 9). "If under contemporary standards the conditions cannot be said to be cruel and unusual, then they are not unconstitutional, and [t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (internal quotation omitted). After showing the objective component, a plaintiff must next establish "a subjective showing of a defendant's culpable state of mind," and "the state of mind necessary to establish liability is deliberate indifference to the inmate's health or safety." *Id.* (internal quotation omitted). Thus, negligence or even gross negligence is not sufficient to support a § 1983 claim. *See Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018).

### a. Commissary

Mr. Benson alleges that he has been denied the ability to order certain hygiene products, soap, shoes, and clothing from commissary. The first question is whether this "condition" is sufficiently serious to deny him the minimal civilized measure of life's necessities. Inmates are entitled to adequate hygiene items and clothing. *See Townsend*, 759 F.3d at 687 ("life's necessities

include shelter, heat, hygiene items and clothing"). The record shows that Mr. Benson is allowed to order deodorant, toothpaste, shaving cream, soap, nail clippers, toothbrushes, shampoo, lotion, and thermal clothing using the Disciplinary Form. Dkt. 32-2. To the extent Mr. Benson alleges that these items are not "sufficient," dkt. 16 at 4, he has presented no evidence to support that characterization. He has not identified any item he is unable to purchase through commissary, much less demonstrated that his inability to purchase that item deprives him of a minimal necessity of civilized life or creates an excessive risk to his health or safety. Although he states that some of the brands are cheap or generic, no reasonable jury could find that Mr. Benson faces a serious risk of harm because of what he is or is not able to purchase through commissary.

Even if Mr. Benson could demonstrate the objective component of his claim, which he has not done, he has not shown that Warden Brown consciously disregarded a known risk to Mr. Benson's health and safety with regard to commissary options.

  **b.**  **Educational and Recreational Programs**

Mr. Benson alleges that he has been held in his cell for 23 hours a day and has been denied access to educational and recreational programs. Dkt. 16 at 4. "The Eighth Amendment, however, does not compel prison administrators to provide general educational programs for inmates." *Johnson v. Randle*, 451 F. App'x 597, 599 (7th Cir. 2011); *Zimmerman v. Tribble,* 226 F.3d 568, 571 (7th Cir. 2000) ("There is no constitutional mandate to provide educational, rehabilitative, or vocational programs, in the absence of conditions that give rise to a violation of the Eighth Amendment.") (internal quotation omitted). Mr. Benson has no constitutional right to participate in educational programs.

"Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*,

81 F.3d 422, 432 (7th Cir. 1996). However, "short-term denials of exercise may be inevitable in the prison context and are not so detrimental as to constitute a constitutional deprivation." *Delaney v. DeTella,* 256 F.3d 679, 683-84 (7th Cir. 2001) (collecting cases). Mr. Benson does not allege that he cannot exercise in his cell or that he has been denied his recreation time outside. *Cf. Turley v. Rednour,* 729 F.3d 645, 652 (7th Cir. 2013) (inmate could state a claim where frequent lockdowns lasting up to 90 days each prevented all exercise, causing health issues); *Delaney*, 256 F.3d at 687 (*"*failure to provide inmates with the opportunity for at least 5 hours of exercise a week outside the cell raised serious constitutional questions"). No evidence indicates that he has been denied recreation to the extent that his health has been threatened. Here, Mr. Benson has not presented evidence sufficient to support either the objective or subjective elements of a deprivation of exercise claim.

        c.      **Temperature and Ventilation of Cell**

In a sworn affidavit filed in response to the motion for summary judgment, Mr. Benson states that he was "extremely cold most of the time while I was housed in the SCU from June 29, 2018, until March 25, 2019, when I was finally able to order me a set of thermals top and bottom." Dkt. 36, ¶ 10. To the extent this testimony conflicts with his deposition testimony, it must be disregarded unless there is an explanation for the conflict. *Abraham v. Washington Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) ("a deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies."). At the time he was deposed, Mr. Benson stated that his cell wasn't cold anymore but that when he filed this action "and for a little while, it was kind of cold." Dkt. 32-1 at 28:10-13. This action was filed on February 8, 2019. Dkt. 1. He also testified that "in the summer, you've got the cold air blowing" from the air conditioning, and "then in the winter if the heat ain't working right, it's cold."

*Id.* at 28-29, 41. His deposition testimony continued, "it might get a little cold where if I'm sitting up trying to do legal work or read or something like that, my hands will be - - you know, get real cold." *Id.* at 39. At those times when he went to sick call, the instrument put on his finger to get his pulse or temperature would not read because his hands were so cold. *Id.*

The Court accepts Mr. Benson's assertions that at times, his cell was very cold. If the air conditioning was blowing too hard, it was cold. In the winter, it could be cold if the heat was not working well, before he ordered thermal clothing. However, Mr. Benson's affidavit testimony that he was extremely cold most of the time conflicts with his deposition testimony and cannot be accepted.

The Seventh Circuit has considered various levels and durations of cold temperatures—and accommodations for those temperatures—in determining whether a constitutional violation exists. *See Haywood v. Hathaway,* 842 F.3d 1026, 1030 (7th Cir. 2016) (Eighth Amendment would have been violated if inmate had been confined for 60 days in a cell with a broken window and temperatures below freezing with blowers blowing and guards refusing to provide blankets or coat). In *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009), the Seventh Circuit held that allegations of being denied adequate clothing in the winter such that the inmate "suffered from hurt ears and numb hands, felt frostbite, and caught colds" did "not rise to the level of the objectively serious harm necessary to show an Eighth Amendment violation." The inmate "did not show that he was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter." *Id.*

An inmate's allegations that it was so cold in his cell every winter that "ice formed on the walls and remained throughout the winter" created material questions of fact of whether the prison's standard-issued clothing and bedclothing were adequate to combat the cold and whether

the defendants knew of the cold and deliberately ignored it. *Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997); *see also Gillis v. Litscher*, 468 F.3d 488, 490 (7th Cir. 2006) (allegations that inmate was forced to sleep naked on concrete floor and had to walk around his cell 14 hours a day to try to stay warm were severe enough to go to trial).

The Court is aware that "[*s*]*ome* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Even accepting as true Mr. Benson's assertion that during the winter of 2018-2019, he experienced cold temperatures in his cell at times, his allegations are much less severe that those alleged in the cases cited above. Mr. Benson alleges that his hands were sometimes too cold to register a temperature or pulse reading from his finger, but that temporary discomfort does not reach the level of a constitutional violation. *See Isby v. Brown,* 856 F.3d 508, 522 (7th Cir. 2017) ("[C]onditions are not unconstitutional simply because they are harsh and restrictive; .... [T]he Constitution does not mandate that prisons be comfortable....") (internal citation and quotation omitted). After this action was filed, in July 2019, the air conditioning system was temporarily producing air that was too cold, but the Warden informed Mr. Benson that he was aware of the problem and a part had been ordered. For a period of less than two months during the winter of 2018-2019, the heating system needed repairs. At this time, Mr. Benson had clothing, blankets, and a coat. The cold temperatures he faced did not fall below the minimal civilized measure of life's necessities. Mr. Benson has not presented evidence sufficient to support the objective component of this claim.

Warden Brown is entitled to summary judgment on Mr. Benson's claim that his cell was too cold.

### 2.     Fourteenth Amendment Claims[1]

#### a.     Equal Protection

Mr. Benson next argues that his equal protection rights have been violated because he does not receive the same privileges as inmates confined in administrative segregation. "To establish a prima facie case of discrimination under the equal protection clause, [plaintiff is] required to show that he is a member of a protected class, that he is otherwise similarly situated to members of the unprotected class, and that he was treated differently from members of the unprotected class." *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (internal quotation omitted); *see also Harvey v. Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011) (same in workplace context). This claim warrants little discussion because Mr. Benson, as an inmate confined in disciplinary segregation, is not a member of a protected class. "Where disparate treatment is not based on a suspect class and does not affect a fundamental right, prison administrators may treat inmates differently as long

---

[1] To the extent Mr. Benson now alleges that he was denied due process when certain property (lotion, sunglasses, pens, a doo-rag, sweatshirt and sweatpants) was confiscated when he was transferred from Miami Correctional Facility to Wabash Valley, dkt. 36 at 6 and dkt. 37-1 at 65, this claim was not alleged in his amended complaint and is therefore not part of this action. Dkt. 16. Even if it had been, it would have been dismissed for failure to state a claim upon which relief can be granted because he was not entitled to a hearing. "[A]n adequate state remedy for a deprivation of property provides all the due process that a plaintiff suing state officers for such deprivation is entitled to." *DKCLM, Ltd. v. Cnty. of Milwaukee*, 794 F.3d 713, 716 (7th Cir. 2015). It is well settled that Indiana law and Indiana's courts provide an adequate remedy to Indiana prisoners asserting claims for deprivation of property. *See Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010) ("To the extent that Watkins relies on the destruction of his personal legal materials, his complaint is better characterized as a deprivation of property claim, for which he may seek relief at state law."); *Wynn v. Southward*, 251 F.3d 588, 592–593 (7th Cir. 2001) ("The district court properly dismissed Wynn's Fourteenth Amendment claims for deprivation or destruction of personal property . . . . Wynn has an adequate post-deprivation remedy in the Indiana Tort Claims Act, and no more process was due.").

as the unequal treatment is rationally related to a legitimate penological interest." *Flynn v. Thatcher*, 819 F.3d 990, 991 (7th Cir. 2016).

"Prison classifications are presumed to be rational and will be upheld if any justification for them can be conceived." *Id.* "Conferring benefits to those with a history of good behavior encourages rehabilitation, institutional security, and the safety of inmates, staff, and visitors." *Id.* The only evidence in the record on this subject indicates that offenders in disciplinary segregation are not permitted to order from the same commissary forms as offenders in administrative segregation as a way to incentivize good behavior and deter conduct that results in placement in disciplinary segregation. Dkt. 32-3 at ¶ 7. Extending broader privileges to inmates who are not in disciplinary segregation is rationally related to a legitimate penological interest. No reasonable jury could find otherwise. Mr. Benson's equal protection claim fails.

  **b.**  **Due Process**

To the extent Mr. Benson refers to his "due process" rights, he is not challenging his placement in segregation. Rather, he alleges that certain privileges are being denied without a hearing. To be entitled to due process, a liberty or property interest must be at stake. *Montgomery v. Anderson,* 262 F.3d 641, 644 (7th Cir. 2001) (when no recognized liberty or property interest has been taken, "the state is free to use any procedures it chooses, or no procedures at all.").

The Warden correctly points to *Sandin v. Conner,* 515 U.S. 472 (1995), in which the Supreme Court held that in evaluating whether a liberty interest exists, the Court must ask whether the conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Warden acknowledges that inmates in disciplinary segregation have a reduced list of commissary items from which they can purchase. The inability to order the full range of commissary products does not present an "atypical and significant

hardship" on Mr. Benson. *See Lekas v. Briley,* 405 F.3d 602 (7th Cir. 2005) (generally speaking, conditions that do not prolong incarceration do not invoke a liberty interest). Mr. Benson is not denied all hygiene and other products. There is no liberty interest at stake under these circumstances.

It appears that Mr. Benson is arguing that IDOC Policy 02-04-102, "Disciplinary Restrictive Status Housing," creates a property interest. Dkt. 37 at 6. He asserts that that policy provides that after 60 days, disciplinary segregation inmates are entitled to administrative segregation privileges, including commissary.

> P. Limited programs and services shall be provided to the offenders either in their living areas or on the unit, based upon the security needs of the facility. *Offenders held on disciplinary restrictive status housing for periods exceeding sixty (60) days are provided the same program services and privileges as inmates in administrative restrictive status housing and Protective Custody. Programs and services shall include, but are not limited to: educational services, commissary services, independent studies, library services, self-help, social services, counseling services, religious guidance, and recreational programs.* Operational procedures shall be developed indicating the programs and services that are available to offenders on the unit and the manner in which offenders may access these programs and services.

Dkt. 37-1 at 4 (IDOC Disciplinary Restrictive Status Housing Policy, No. 02-04-102) (emphasis added).

"Unless the regulation limits an official's discretion in denying the benefit to 'objective and defined' criteria, no protected interest has been created." *Campbell v. Miller*, 787 F.2d 217, 223 (7th Cir. 1986) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). The IDOC policy does not place substantive limits on the discretion of prison authorities in limiting commissary. Rather, the policy further states, "Operational procedures shall be developed indicating the programs and services that are available to offenders on the unit and the manner in which offenders may access these programs and services." Dkt. 37-1 at 4. This allows for additional decision-making and thus

the policy alone does not create a protected property interest. As the Supreme Court is often quoted,

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

*Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Even if this IDOC policy did create a protected property interest, due process would not require any type of hearing before an inmate is denied access to certain commissary items. Mr. Benson has not alleged that post-deprivation remedies are inadequate, which defeats his claim. *See Tenny v. Blagojevich*, 659 F.3d 578, 583 (7th Cir. 2011) (having an adequate post-deprivation remedy "dooms [his] constitutional due process claims."); *see also Moore v. Pemberton*, 110 F.3d 22 (7th Cir. 1997) (temporary loss of ability to buy snacks at commissary did not constitute the loss of any liberty or property). Warden Brown is entitled to summary judgment on Mr. Benson's due process claim.

## IV. Conclusion

For the reasons discussed above, the defendant's motion for summary judgment, dkt. [32], is **granted.** Judgment consistent with the screening Entry of March 29, 2019, dkt. [8], and this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 8/4/2020

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

CHARLES A. BENSON
202702
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All electronically registered counsel